John Lazzaretti, U.S. Steel Corporation Co-Counsel David Hacker, U.S. Steel Corporation Law Department Your Honors, in any rulemaking, EPA has a duty to treat like cases alike, to practice reasoned decision-making based on the facts in the record, to respond to substantive comments, and to adhere to the mandates of the statute. The revised federal implementation plan before this Court violates all four of those precepts. Before getting into the details of why, I'd like to step back and start with a few salient facts that set this case apart from a typical petition for environmental review. First is that the rulemaking at issue applies to the taconite industry. Taconite is mined in only two states, Minnesota and Michigan. The taconite rule applies to only seven facilities, and those seven facilities are owned by only three companies. United States Steel Corporation, Cliffs Natural Resources, which is now Cleveland Cliffs, and ArcelorMittal. How many of those are U.S. Steels? U.S. Steel has two of those facilities, Mintec and Keytec. And the reason I point that out is that when the United States emphasizes that its revised FIP only applies to four facilities, that is the rest of the industry that the rule applies to. The only facility that wasn't addressed, North Shore, is a very small facility that could already comply with even the original FIP limits. So there's no reason to address it, and nobody asked EPA to make any changes with respect to North Shore. The second issue I'd like to point out is that EPA in this rule is not just asking for an add-on control to combustion, to the exhaust from the facility. The FIP deals with the actual combustion process of indurating pelts. And the reason I want to emphasize that is that it underscores how complex the process is that U.S. Steel was developing in 2010 and 2011. U.S. Steel was the pioneer in implementing a new low-NOx main burner system for the reduction of nitrogen oxides in the indurating furnace process. But it was a complicated process, and changes to it have a potential impact not only on emissions, but on pellet quality, on the product that these furnaces were designed to create. Is it true that there's a big difference between you and the other two in that they came forward with evidence and you did not come forward with evidence? And that's why the revise doesn't apply to U.S. Steel. Not at all, Your Honor, and we understand that that's the United States' position, but it's not supported by the record. We cite to a couple examples. First, in the record, in the original FIP record, is EPA's pioneering work on low-NOx main burner systems. And at that time, U.S. Steel highlighted, when it was installing a pilot technology at Line 6 and Line 7 at MINTAC, the very same issues that Cliffs and Arcelor later said would apply to them in their petitions for reconsideration and the very same facts that the United States cited as the grounds for granting reconsideration. Namely, they identified problems with managing the increased airflow from a low-NOx main burner system. They identified the problems that would affect pellet quality. It would affect compressibility. It would affect the ability to handle multiple types of ore body. It would affect the types of pellets that could be created because you have acid pellets and you have flux pellets. Those can have a different emissions profile. So at the time, when this technology was being developed, U.S. Steel identified that while it could, under certain circumstances, achieve a 70% reduction in NOx, it had not fully vetted that. It still had serious engineering concerns as to whether that could be applied across the full range of operating conditions. And that's the very factual basis that EPA relied on for granting reconsideration. That information was relevant to the original FIP, correct? It was relevant to the original FIP as well as the revised FIP. But did U.S. Steel ask the agency to reconsider the BART for them in connection with the revised FIP? Yes, Your Honor. There are two petitions for reconsideration that were submitted to EPA, one based on the original FIP and one based on the revised FIP. We have received a letter that those petitions were denied, but to date EPA has not published that in the Federal Register. But those aren't before us here. Those aren't a part of this case, correct? The EPA's decision on those petitions is not before the court, nor is the record in the revised FIP petition for reconsideration. But it is worth noting that the first petition for reconsideration, that's the second body of additional factual support. In our first petition for reconsideration, United States Steel submitted additional testing data, additional statements from its engineers that helped support the record, and that was back in 2013. So that was well before the revised FIP. So EPA had all that information. In addition to information they got through 114 requests, which are information collection requests under the Clean Air Act. So in addition to our original engineering studies that already identified these issues, U.S. Steel continued over the years to supplement that information with additional data based on the operations at Lines 6 and 7 and based on their efforts to continue to install low NOx burners at the other lines at MNTAC that continue to support and continue to bolster the very issues that we were saying would be a problem. And maybe I don't understand the process well enough, but when you say they continue to update the EPA, what do you mean by that? Do you mean in the context of a specific request to reconsider or review a BART determination, or are you referring to something else? Both. One is that there was a petition for reconsideration of the original FIP where we supplied additional data, and the other is that EPA has over the years sent information collection requests. So these are collection requests to assist the agency in developing its rules, and so to assist the agency in evaluating its BART determination for U.S. Steel, we received several voluminous requests for additional information, and we prepared and submitted additional data with respect to those. So that was an administrative process that EPA was undergoing while these petitions were being evaluated by the agency. And that's in our main brief we cite to the 114 requests. Our responses to those are in the record. Well, let me ask a question and see if I can, and excuse me if I get too simplistic about this, but as I understand it, here U.S. Steel is challenging the revised federal implementation plan which grants relief to its competitors but does not directly affect U.S. Steel. Is that correct? Is that a correct statement? It's substantially correct. So if that's true, why does U.S. Steel have standing in this appeal? Yes, Your Honor, there's two grounds for standing. I mean, one, we satisfy Article III standing fairly easily. This is a rulemaking that affects us. We are directly regulated. There was a modification of the SO2 deadlines in it. The second component is that the fact that EPA substantively revised the entire process for establishing NOx limits for the taconite industry and decided to exclude U.S. Steel from that process injures U.S. Steel directly. This is a commoditized industry to make taconite pellets that are themselves used for the manufacture of steel. The cost competitiveness is very tight. Competitive disadvantages can be fatal to a taconite facility. And so it's very important that EPA in this context treat like cases alike. Are the different facilities different in their processing or the structure of their facilities? All of the facilities indurate taconite pellets, but they all have different engineering designs. These were facilities built between 1962 and 1977. There's a couple of fundamental differences in the configuration. Some are straight grate. Some are grate kiln designs. So do those – Sorry, go ahead. Complete your thought. In addition to that, there are individual design elements. These are not cookie-cutter furnaces. These are – some have preheat burners, some do not. But even with the same general characteristics, each furnace is burning its own – it's indurating its own pellets. It's dealing with different ore types. They have different airflow volumes. There's a number of specifics. So do those differences then warrant the agency treating them differently for purposes of BART? It seems like that's one of the main disputes between you and the agency as to whether there was a one-size-fits-all approach or whether they were doing this on a facility-by-facility or case-by-case basis. And if the differences in the facilities are as you describe them, how is it that you are swept up in their case-by-case analysis? For two reasons. The first is that what EPA is doing here is applying a different approach. So our point is that those individual characteristics had to be considered by the agency. They did not do that in the original FIP. So they did not do that as the U.S. deal. The assumptions, the key assumptions in the original FIP were that the technical distinctions between furnaces were insignificant and would not impact the emissions from each line. That's the very fact that they have now changed. Now in the revised FIP they say, it turns out, after further study, and based on the record we now have, the technical variations between each line are very significant and, in fact, eliminated from consideration the high-stoic, low-NOx main burner systems that we originally thought were BART. U.S. deal is entitled to the same evaluation. So the method of determining whether, so first we're entitled to an evaluation of whether our technical differences require a change. And the second is the method for selecting an emission limit is now very different. In the original FIP, the assumption was that technical variations would have no impact on the emission profile. And so every facility was assigned a 1.2 pounds per million BTU limit for natural gas and 1.5 pounds per million BTU when mixed with solid fuels across the board. Now EPA recognizes not only that these technical variations can significantly change the emission profile, but that it is impossible to predict the final emission limit until the low-NOx main burner system or other control is installed and actually operating across the full range of operations. And that's getting... Well, if that's so, if there is sort of a realization that there is more variation among the facilities, and maybe you've answered this, but why can't U.S. Steel go in and do what the competitors did and ask for a reassessment? We did do that. And so then what is, how is this, why this lawsuit if you're doing exactly what the competitors did in another proceeding? This lawsuit is because EPA is standing on our petition for reconsideration. First off, it's helpful to step back and see why EPA issued this revised FIP. This didn't come out of three petitions for reconsideration. EPA decided to grant two and deny one. This started with a highly flawed and suspect federal implementation plan that this court stayed pending appeal. That appeal, the stay, was issued to three parties, Cliffs, Arcelor, and the State of Michigan. U.S. Steel wasn't a party to that. What EPA did was enter into side private settlement negotiations with those three parties and entered into a settlement agreement where they determined that they would scrap the 1.2, the hard emission limit. They would develop a new process where they establish a range, allow them to install controls, and then find out what limit would apply within that range. And then they memorialized that settlement agreement in the revised FIP and used the granting of the petitions for reconsideration as a vehicle to do that. U.S. Steel wasn't a party, so EPA has declined to, not only declined to evaluate U.S. Steel's position, whether U.S. Steel should be subject to that same consideration, it's declined to grant our petition for reconsideration. So it's basically achieving through a revised FIP what it could not have done in an original FIP, which is apply one standard to U.S. Steel and another standard to everybody else in the industry. So where in the record do we go to find reference and a description in an adequate form that discusses the injury that U.S. Steel claims that it suffers here? I know apparently this is an allegation of competitor standing, where your competitors are, restriction is lifted with respect to competitors but not with respect to U.S. Steel, but standing can't be based on just allegations. Where in the record do we go to find reference to actual injury here that would support standing in the case? The injury to U.S. Steel was discussed in our comments, so that issue was raised. It is supported by the declaration of Larry Sutherland that is in the record. There really isn't a dispute, I think, among the parties that we are in competition with Cliffs and Arthor for the production of taconite pellets and that we, if put at a competitive disadvantage, if forced to incur costs that they are not, that that injures U.S. Steel. Does the record reflect that you buy from them? Do you buy from those other two, Cliffs and – I know they're a competitor in this part of the process, but do you buy any of these pellets from the other two, U.S. Steel? Does the record reflect that? No, Your Honor, the record doesn't discuss – you mean as far as the steel production operations? For example, Cliffs doesn't operate a steel production facility. All they do is generate pellets. So we are competing on the taconite pellet front. Another issue that's important to emphasize is that we are dealing with a regional haze rule. The entire purpose of this rule is to improve visibility in Class I federal areas. So the touchstone of EPA's action has to be a visibility and improvement analysis. It has to be, is what we're doing going to contribute to improvement and visibility in Class I federal areas? And what the revised FIP lacks entirely is a visibility analysis. This is required by statute to determine if technology is in fact BART. It's also required in EPA's regulations. Now, this is the argument that you waived in your comments to the FIP and you're relying on somebody else's comments, right? We are relying on the find-a-lack ban's comments. I didn't mean to trick you at the front part of that question. But you didn't raise them in your comments, but the Native Americans did, right? Yes, Your Honor. So we would not concede that it's waived, but we are relying on another party's comments. But that's wholly appropriate in the administrative judicial review context. Your Honors, I'm eating into my rebuttal time. So if you may, I'll sit down and reserve the rest of my time for rebuttal. Please do. Mr. Greenberg? May it please the Court, Alan Greenberg, United States Department of Justice, appearing on behalf of the United States Environmental Protection Agency and its administrator, Scott Pruitt. With me at council table is Matthew Marks from EPA's Office of General Counsel in Washington, D.C. Your Honor, in this case, United States Steel is challenging a revised federal implementation plan, or FIPP, under the Clean Air Act's Regional Haze Program that revised emission limits for four taconite facilities not owned or operated by U.S. Steel. Significantly, U.S. Steel does not argue that EPA incorrectly set emission limits in the revised FIPP for these four facilities that are operated by U.S. Steel's competitors. And it does not seek reversal of the revised FIPP, which is the remedy that this Court could provide. Instead, the thrust of U.S. Steel's argument in this case is a challenge to the original FIPP that EPA issued in 2013, and that set emission limits for U.S. Steel's taconite facilities. But that 2013 FIPP is not before this Court today. Because U.S. Steel's challenges are misdirected, its arguments that it presents are similarly misdirected. It asserts numerous challenges that either this Court lacks jurisdiction to hear or do not demonstrate that the revised FIPP is arbitrary or capricious. Significantly, its arguments relating to disparate treatment do not carry the day. Because EPA's application of the same methodology, the same regulatory methodology to different circumstances at different facilities does not constitute impermissible disparate treatment. I will first address EPA's authority to issue this revised FIPP, and then I will demonstrate why EPA did not act arbitrarily or capriciously when it granted reconsideration to the selection of BART at Cliffs and Arschler-Mittles facilities. Well, before you do that, I asked a couple of questions earlier suggesting there may be a standing issue here. What do you think about that? I think the response was that the EPA has conceded that, as a result of all this, that U.S. Steel is at a competitive disadvantage and is suffering and stands to suffer economic harm. Is that accurate? Do you concede that they're standing in this case, that there's proof that there's sufficient allegation and support in the record of economic harm and injury that would give U.S. Steel standing? We would acknowledge that there is potential injury for purposes of standing, but the question under standing goes to redressability, the third prong of the constitutional standing test. Here, U.S. Steel is challenging the revised FIPP. If the remedy it was seeking was to reverse the revised FIPP and claiming that that was its injury, then its injury could be redressed by this court. That's not what U.S. Steel is seeking. U.S. Steel is not asking for this court to reverse the revised FIPP, and as a result, as we noted in the last section of our argument in our brief, there is a redressability issue. And as I heard Counsel for U.S. Steel, he cited to the SO2 limits. That's not an issue in this case. That's not an injury that they've briefed or that they're contending provides the necessary standing. The issue here is the emission limits applicable to U.S. Steel's facilities that were set in the original FIPP in 2013. That's not before this court. But aren't they saying that the methodology has changed, that the EPA has decided that there's a different approach that is more appropriate in determining the BART, and that should apply to them, too, and that that's the injury? That is the injury, Your Honor, but as I pointed out, the question is redressability. And so there's nothing that the agency can do to include them in that revised FIPP? No, I think the important question is there's nothing the court can do in this proceeding to include them in the revised FIPP, And that's why the challenge to the revised FIPP raises the standing issues that have been raised by Judge Shepard. Briefly touching on authority, since authority is, of course, a prerequisite to EPA even issuing this revised FIPP, there are three easy reasons why EPA has authority to issue this revised FIPP. First, the argument was waived because U.S. Steel did not comment on EPA's authority. Second, it's a collateral attack on the original FIPP. Excuse me, it's a collateral attack on EPA's disapproval of the state SIPP. That's the second related rulemaking in this case. And because their argument on authority is based on their assertion of a compliance state SIPP, that is a challenge that should have been brought and could be brought in the 2013 SIPP disapproval challenge, but not here. And on the merits, EPA has authority because the state of Minnesota has not submitted and EPA has not approved a compliant SIPP at this point in time. U.S. Steel's remaining arguments are generally variations on a theme. And that theme is based on the incorrect assertion that the EPA employed a new approach or new methodology in the revised FIPP and somehow conceded that the approach in the original FIPP was flawed. But U.S. Steel's premise is incorrect. EPA used the same methodology in the original FIPP as it did in the revised FIPP. It's a five-step methodology set forth in the BART guidelines. In the original FIPP, it applied that methodology to the seven taconite facilities, did a step-by-step analysis, and determined that high-stoic, low-NOx burners were BART for all seven facilities. Cliffs and ArcelorMittal submitted new information in connection with a petition for reimbursement that called into question the BART determinations made in the original FIPP. Well, in the reply brief to you, U.S. Steel makes the flat statement. They provided the same type of data to you. They cite two pages of the record and two charts. They're hard to understand. What do you say about that? We would disagree with that, Your Honor, in a couple points in response to what U.S. Steel presented. First, they cited as evidence the materials relating to MINTAC 6 and 7. And, yes, initially there were issues with pellet quality and fuel use when they installed those low-NOx burners, but by the time EPA issued its original FIPP, U.S. Steel had worked out those problems. There were no issues at 6 and 7 with respect to any of those potential technical problems. I refer the court in the record to appendix pages 1229, 1260-61, and 1259. And second, with respect to the argument that they did submit that information, at the time EPA issued its revised FIPP, that wasn't a correct statement. And I would ask the court to compare the petition for reconsideration that they submitted in 2013 and its contents, and that's found at appendix 2001 in consecutive pages, with the petition for reconsideration that they submitted after the revised FIPP. We contend that's not in the administrative record, although they submitted it as part of the appendix. It's at appendix page 41 at SEC. If you look at what they submitted before, which does not contain the materials, the technical analysis, the engineering evaluations, the proposals for an alternative BART at these facilities, that's not in the 2013 petition for reconsideration. Some of that is in the 2016 petition, but that postdates the revised FIPP. EPA did not have that at the time it issued its revised FIPP. It did have that kind of material from Cliffs and ArcelorMittal. And with respect to the 114 request responses that were referenced, those are not in the administrative record either. Those are primarily posted. The reply brief, they cite 1255. That's very close to something you referenced. It's what they cite as the same type of data that they did supply you as the others. Right. And 1255 deals with an identification of an issue that they were having with the BART, with the installation of the Lonox burners at Mintak either 6 or 7. But if you get to the end of that report, the conclusion is we dealt with it. We figured out a way to operate our Lonox burners so that this issue we identified was solved. We could obtain 70% reduction of NOx without incurring fuel penalties, without harming our pellets through the facility. And that is a key point I want to emphasize also in response to Judge Kelly's questions. We aren't simply situated in the Taconite facility. When EPA issued the original FIP, U.S. Steel had already installed high stoic Lonox burners on two of its furnaces. Pursuant to state requirements, they did make the effort and demonstrated that this was a feasible technology for Taconite facilities, and specifically their Taconite facilities. That places them obviously in a different situation from Cliffs and ArcelorMittal, who came in after we issued the original FIP and said, wait, we can't do what U.S. Steel already did for the following reasons based upon the engineering analysis and technical studies we have done. For example, with Cliffs, we can't do a high stoic Lonox burner, but we can do a low stoic Lonox burner. So let us do the low stoic Lonox burner instead. And that's what EPA did in the revised FIP, which is perfectly reasonable, nothing arbitrary and capricious, by EPA determining on a petition for reconsideration that a particular facility submits material central to the issue and that couldn't have been raised at the time of the prior rulemaking. That calls into question some of the conclusions that have been made in the original FIP. Can you help me understand the other proceeding that is ongoing with respect to U.S. Steel that U.S. Steel's counsel referred to? Sure. Is there a parallel proceeding going on with respect to U.S. Steel's, I guess, response to the revised FIP? U.S. Steel submitted two administrative petitions for reconsideration. They sought administrative reconsideration of EPA's SIP disapproval, the disapproval of Minnesota's SIP, and bootstrapped into that a request for reconsideration of the original FIP. And then recently, in 2016, they filed a petition for reconsideration of this revised FIP. After the revised FIP was issued, obviously. That's not before this court. Is that a proceeding where they could get reconsideration of their own BART? Yes, it could. And EPA, as Mr. Lazzaretti mentioned, denied that reconsideration petition in January of this year. That can be challenged at this point. It doesn't have to wait for the Federal Register notice. There's an EPA regulation at 40 CFR 23.3 that provides that if it doesn't appear in the Federal Register, you can still go ahead and challenge that. So that would be a vehicle for U.S. Steel to raise its specific issues relating to its furnaces, its technology, its engineering analysis, to the extent it provided it to EPA in support of its petition for reconsideration. But that material was not before EPA at the time EPA issued this revised FIP. What is the status of an appeal of what happened in January? Tell me if I'm even asking the right question. It can be brought. It has not yet been brought by U.S. Steel. What's the time frame, the deadline? If it's not published in the Federal Register, it's the default 6-year statute of limitations under. Thank you. A couple of the remaining arguments that were presented by U.S. Steel in this case can easily be addressed. Mr. Lazzaretti raised the visibility issues. Those can be discounted for three reasons. First, it was an argument that was waived. The Fond du Lac banned comments supported the visibility analysis in the original FIP. That doesn't put EPA on notice that anyone is criticizing the visibility analysis. They didn't even use the word visibility, right? There's a misquotation running around the record. They used the term regional haze, correct? They did. The comment is ambiguous to start with, and even if you're going to rely on it, the tribes were seeking more rigorous regional haze protections because they are in a location that's impacted by the emissions that impact visibility. So this is not something that rescues U.S. Steel from having not commented. It's also a collateral attack on the original FIP because the visibility analysis that U.S. Steel is critiquing was in the original FIP. It can't be challenged here. And finally, it's not arbitrary and capricious for the actual visibility analysis that EPA did. In this revised FIP, they made a determination that the revisions would reduce by 16% what otherwise would have been the reductions in visibility impacts. That 16% is supported by the record. EPA doesn't have to do an elaborate scientific analysis. It simply needs to reasonably determine visibility. With respect to the comment that U.S. Steel submitted, EPA adequately and properly responded to those comments. There was no error so serious and of central importance that there was a substantial likelihood that the rule would have been significantly changed. And I think the comments provide a big picture of what is really at issue here. The comments that EPA said were not germane. The first one, U.S. Steel said, a similar approach will be necessary for U.S. Steel's MNTAC and KTAC plants. They're acknowledging that they need to deal with this in a separate future rulemaking because the revised FIP doesn't put into play the emission limits that are applicable to KTAC and MNTAC. Similarly, the comment was, there should be a stay pending completion of a similar amendment for U.S. Steel. Again, acknowledging this particular rulemaking and this particular record supported the revisions of the FIP to cliffs and arsenal and rental facilities, a separate proceeding, a future proceeding, would be needed for whatever revisions would be appropriate for U.S. Steel's facilities. And again, the last comment that EPA said was not germane sought reconsideration of EPA's disapproval of Minnesota's SIP. And again, that's not before EPA in this rulemaking. It was not germane. EPA appropriately responded to the comments that U.S. Steel submitted. Can you help me understand how the new BART that is applicable to what I'll call the competitors puts them at a competitive advantage over U.S. Steel? Is there any sort of simple, general way to describe that? If, in fact, U.S. Steel is the one that proposed or had already in place the emissions controls kind of technology? I would probably be speculating on this point. The question probably is best directed to Mr. Lazzaretti. I'm assuming that the controls that EPA found as BART in the revised FIP may be less expensive to install or less expensive to operate than the high-stoic, low-NOx burners that U.S. Steel. But I have not delved into that. What's in the record with respect to any of that that would take it beyond mere speculation? There is material in the record that relates to the costs associated with the BART technologies at the Cliffs and Arsler middle facilities. It's hard to sort of compare apples to apples because there are a lot of variables at these facilities. U.S. Steel submitted cost data in connection with the most recent petition for reconsideration. I don't recall if that cost data was in the 2013 petition for reconsideration. I see that my time is up. I urge the Court to dismiss the petitions for review. Thank you. Mr. Lazzaretti. Your Honors, if I may start by addressing Judge Kelly's question. There are three key elements that subject us to a competitive disadvantage. The first you can see is the limits themselves. U.S. Steel's facilities are subject to a 1.2 limit for natural gas, 1.5 for mixed fuels at all lines. The great kiln competitors of U.S. Steel owned by Cliffs are subject to somewhere between a range of 2.8 to 3.0 for natural gas and a range of 1.5 to 2.5 for mixed fuels. So it's a much higher limit. It's easier to achieve. Another element is the flexibility of the limit. We are given a hard number, 1.2. It has to be complied with when burning 100 percent natural gas under all conditions, all ore types, all pellets, whether we have a pellet quality problem or not. Cliffs and Arcelor are given flexibility. They're given a range, 2.8 to 3.0, 1.5 to 2.5. After they install, they get to shake down, operate their facilities through the entire range of products, ore types, pellet qualities, and then set a limit that does not force them to address pellet quality issues, excess fuel consumption, which is not only a cost issue but an emissions issue, and safety concerns. We don't have that flexibility. The third issue is the schedule for compliance. U.S. Steel already has to comply at Line 6. Line 7 has to comply next year. The only other facility that has to comply next year is North Shore, which could already comply before the original FIP. The other limits don't apply until 2019 to 2021. So U.S. Steel has stricter limits that are less flexible and they have to comply sooner than everybody else. That puts a substantial burden on U.S. Steel. Another issue that was raised is the interpretation of U.S. Steel's own reports on Line 6 and 7 and the status of the technology. U.S. Steel was at the time pioneering a low NOx burner. They did conclude that it was achievable to obtain a 70% reduction, but those reports are filled with the caveats and concerns that became a problem for Cliffs and Arcelor. We emphasized at the time that that limit had to be averaged across all lines. EPA, the limit applies individually to each line. They're not allowing averaging. We emphasized at the time that there could be concerns with different ore bodies, different types of pellet quality, and that we had not operated across all range of operating conditions. That's the very thing that they are allowing a range now to address, and it's not included in the original FIP. U.S. Steel doesn't have that flexibility. Another important point is that EPA continually emphasizes that Lines 6 and 7 have installed a low NOx burner. First, that doesn't address what level the low NOx burner has to operate, 1.2 or something closer to 2.8 to 3.0, but also it says nothing about Lines 3, 4, and 5 at Mantec or Ketac. They did not have low NOx burners installed at the time. There is no data in the record to support that they could achieve the same results as Lines 6 and 7. And the problem with the revised FIP is EPA never looked. They never said, will these same problems that we now know are going to cause cliffs in our sewer to fall short of our initial limits? Will these apply to Lines 3, 4, and 5 at Mantec? Will this apply to Ketac? We submit they should have also looked at Lines 6 and 7, but there's absolutely nothing in the record to support that decision. So your view is it was EPA's responsibility that once the competitors brought these issues to the forefront that it was EPA's responsibility to scoop up U.S. Steel in it? Yes, Your Honor, and that is not uncommon. In fact, U.S. Steel's data was relied on by EPA for making several technical determinations as to cliffs in our sewer. Once they have a record that they conclude that their initial methodology was faulty, they have to use reasoned decision-making based on that new record. They knew there was a problem with their original FIP. There's nothing in the record to support why they excluded U.S. Steel. That was the essence of arbitrary and capricious rulemaking. Your Honor. Thank you. Thank you for the argument. Case 16-2668 is submitted for decision, and we'll hear you now in Case 16.